## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| PRINCIPLE SOLUTIONS GROUP, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:15-CV-4130-RWS |
| | : | |
| IRONSHORE INDEMNITY, INC., | : | |
| | : | |
| Defendant. | : | |

## <u>ORDER</u>

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment [Doc. No. 22], Defendant's Motion for Summary Judgment [Doc. No. 32], Plaintiff's Motion to Exclude [Doc. No. 38], and Plaintiff's Motion for Judicial Notice [Doc. No. 39].

## I.    Factual Background

This is an insurance dispute in which Plaintiff Principle Solutions Group ("Principle") seeks payment of $1.717 million from its insurer, Defendant Ironshore Indemnity ("Ironshore").

On July 8, 2015, Principle was the victim of a fraud scheme.  At 9:10am that day, Principle's controller received an email from a person purporting to be

Josh Nazarian, one of the managing directors for Principle [Doc. No. 22-7, ¶ 2, admitted; Doc. No. 22-3, p. 6].  The email appeared to have been sent from his corporate email address [Id.].  The email referenced a company acquisition and instructed the controller to "treat the matter with the utmost discretion" [Doc. No. 22-7, ¶ 3, admitted; Doc. No. 22-3, p. 6].  The email also instructed the controller to work with an attorney, Mark Leach, to "ensure that the wire goes out today" [Id.].  Mr. Nazarian was not in the office on the day of the fraudulent email [Doc. No. 22-7, ¶ 4, admitted].  He did not send the email [Doc. No. 22-7, ¶ 5, admitted].

Later that morning, the controller received an email from a "Mark Leach" who represented himself to be a partner at Alston & Bird [Doc. No. 22-7, ¶ 6, admitted; Doc. No. 22-3, p. 9].  Mr. Leach stated that he was reaching out at the request of Mr. Nazarian [Id.].  Mr. Leach also sent wiring instructions to a bank in China [Id., Doc. No. 22-3, p. 11].  At 10:15am, Mr. Leach called the controller and emphasized that they needed to complete the wire transaction that day and that he had Mr. Nazarian's full approval to execute the wire [Doc. No. 22-7, ¶ 8, admitted].

The controller was not able to forward an email to the financial institution to wire the funds because the institution required more than an email to wire funds

AO 72A
(Rev.8/8
2)

from an account [Doc. No. 22-7, ¶ 9, admitted].  So, the controller logged into the company's online account to enable the approval function and to verify the capability to wire internationally in different forms of currency [Doc. No. 22-7, ¶ 10, admitted].  She then called Mr. Leach to confirm the capability and instructed another Principle employee to create the wire instructions [Doc. No. 22-7, ¶ 11, admitted].  The controller then approved the wire [Doc. No. 22-7, ¶ 12, admitted].

The financial institution's fraud prevention unit called and emailed the controller requesting verification of the wire [Doc. No. 22-7, ¶ 13, admitted].  The financial institution requested the controller to verify how Mr. Leach had received the wire instructions [Doc. No. 22-7, ¶ 14, admitted].  The controller called Mr. Leach and was told he verbally received the wire instructions from Mr. Nazarian [Doc. No. 22-7, ¶ 15, admitted].  The controller relayed this information to the financial institution, and the financial institution released the wire [Doc. No. 22-7, ¶ 16, admitted].

The next day, the controller spoke with Mr. Nazarian and told him that the wire had been made in accordance with his instruction [Doc. No. 22-7, ¶ 17, admitted].  Mr. Nazarian had no knowledge of the emails, Mr. Leach, or the wire

3

instructions, and he immediately called the fraud department of the financial institution to report the fraud [Doc. No. 22-7, ¶ 18, admitted].  Neither the financial institution nor law enforcement were able to recover the funds [Doc. No. 22-7, ¶ 19, admitted].  Principle suffered a $1.717 million loss [Doc. No. 22-7, ¶ 20, admitted].

Principle is the named insured under Commercial Crime Policy No. 001512502 for the policy period of December 20, 2014 to December 20, 2015 [Doc. No. 22-7, ¶ 21, admitted].  Principle paid the premium for the Commercial Crime Policy [Doc. No. 22-7, ¶ 22, admitted].  The Commercial Crime Policy provides coverage for specifically-defined categories of crimes, one of which is "Computer and Funds Transfer Fraud" [Doc. No. 22-7, ¶ 23, admitted].  The "Limit of Insurance" is $5,000,000 per occurrence with a $25,000 deductible per occurrence [Id.].

Specifically, Section A.6 of the Commercial Crime Policy states:

a.    We will pay for:
(2)   Loss resulting directly from a "fraudulent instruction" directing a "financial institution" to debit your "transfer account" and transfer, pay or deliver "money or "securities" from that account.

4

[Doc. No. 22-4, p. 7].  The Commercial Crime Policy further provides various

definitions in Section F, including the following:

9.    "Financial institution" means:
      b.    With regard to Insuring Agreement A.6:
      (1)   A bank, savings bank, savings and loan association, trust
            company, credit union or similar depository institution;
      (2)   An insurance company; or
      (3)   A stock brokerage firm or investment company.

12.   "Fraudulent instruction" means:
      a.    With regard to Insuring Agreement A.6.a.(2):
      (1)   A computer, telegraphic, cable, teletype, telefacsimile,
            telephone or other electronic instruction directing a "financial
            institution" to debit your "transfer account" and to transfer,
            pay or deliver "money" or "securities" from that "transfer
            account", which instruction purports to have been issued by
            you, but which in fact was fraudulently issued by someone
            else without your knowledge or consent.
      (2)   A written instruction (other than those covered by Insuring
            Agreement A.2.) issued to a "financial institution" directing
            the "financial institution" to debit your "transfer account" and
            to transfer, pay or deliver "money" or "securities" from that
            "transfer account", through an electronic funds transfer system
            at specified times or under specified conditions, which
            instruction purports to have been issued by you, but which in
            fact was issued, forged or altered by someone else without
            your knowledge or consent.
      (3)   A computer, telegraphic, cable, teletype, telefacsimile,
            telephone or other electronic or written instruction initially
            received by you, which instruction purports to have been
            issued by an "employee", but which in fact was fraudulently
            issued by someone else without your or the "employee's"
            knowledge or consent.

16.   "Money" means:

5

a.      Currency, coins and bank notes in current use and having a
        face value;

b.      Traveler's checks and money orders held for sale to the public;
        and

c.      In addition, includes:

        (1)     Under Insuring Agreements A.1. and A.2., deposits in
                your account at any financial institution; and

        (2)     Under Insuring Agreement A.6., deposits in your
                account at a "financial institution" as defined in
                Paragraph F.9.b.

[Doc. No. 22-4, pp. 16-19].

Principle notified Ironshore of its claim consistent with the terms of the

Policy [Doc. No. 22-7, ¶ 26, admitted].  Thereafter, Principle submitted a Sworn

Proof of Loss to Ironshore under the Commercial Crime Policy, which it later

amended, seeking coverage under the Commercial Crime Policy [Doc. No. 22-7,

¶ 27, admitted].  Ironshore denied coverage for the claim on July 24, 2015 [Doc.

No. 22-7, ¶ 29, admitted].

On October 20, 2015, Principle filed this action in the Superior Court of

Fulton County, Georgia [Doc. No. 1-2].  The action was removed to this Court on

November 25, 2015, based on this Court's diversity jurisdiction.  The Complaint

alleges claims for Breach of Contract and Bad Faith pursuant to O.C.G.A. § 33-4-

6 [Doc. No. 1-2].

AO 72A
(Rev.8/8
2)

## II.    Plaintiff's Motion to Exclude [Doc. No. 38]

Plaintiff Principle has moved the Court to exclude Exhibit 2 [Doc. Nos. 30-2 and 32-4], which was submitted by Ironshore in support of its summary judgment briefing.   Principle contends that Ironshore has failed to properly authenticate the document.   Principle also contends that Exhibit 2 should be excluded because it is not relevant, and even if it was, it should be excluded pursuant to Federal Rule of Evidence 403.   Finally, Principle contends that the document was not properly provided according to Local Rule 56.1.

Exhibit 2 is a document that purports to be an endorsement and is titled "Add Cyber Deception Coverage."   Ironshore argues that this exhibit is provided as an illustration of the type of policy language which may provide coverage for this type of claim and that it is merely an aid for the Court in construing the Policy language.   The Court agrees with Principle that Exhibit 2 is not relevant.   The endorsement is not part of the Policy at issue in this case.   Also, it appears to be dated March 2015, and there is no evidence that Ironshore has sought or received approval from the Georgia Department of Insurance to use the endorsement in Georgia.   It is not relevant to determining coverage under this Policy and is not

AO 72A
(Rev.8/8
2)

relevant to the coverage issued raised by the parties.  As such, Plaintiff's Motion to Exclude [Doc. No. 38] is GRANTED.

### III.   Plaintiff's Motion for Judicial Notice [Doc. No. 39]

Plaintiff Principle has moved the Court to take judicial notice of certain filings made with the Georgia Department of Insurance [Doc. No. 39].  Specifically, Principle requests that the Court take judicial notice of the following facts: (1) Form SURE-130089150 was drafted by The Surety & Fidelity Association of America and was filed with the Georgia Department of Insurance because it was located in the Department's SERFF database; and (2) Ironshore's Exhibit 2 [Doc. Nos. 30-2 and 32-4] was not filed with the Georgia Department of Insurance because it cannot be located in their SERFF database.

As to the first fact, Ironshore does not oppose Plaintiff's Motion, and Plaintiff's Motion [Doc. No. 39] is GRANTED as to that fact.  The Court will take judicial notice that Form SURE-130089150 was drafted by The Surety & Fidelity Association of America and was filed with the Georgia Department of Insurance.  The Court also takes judicial notice of its contents.

As to the second fact, Ironshore contends that this fact is not relevant to any issue in this case.  As discussed above, the Court agrees.  The cyber-deception

AO 72A
(Rev.8/8
2)

endorsement is not a part of the Commercial Crime Policy issued by Ironshore to Principle.  Accordingly, whether or not the endorsement has been filed or approved for use in Georgia is irrelevant to the issue of whether the Policy covered the loss in this case.  As to the second fact, Plaintiff's Motion [Doc. No. 39] is DENIED.

For the reasons stated above, Plaintiff's Motion for Judicial Notice [Doc. No. 39] is GRANTED in part and DENIED in part.  The Court will take judicial notice of the first fact but not the second.

## IV.    Motions for Summary Judgment [Doc. Nos. 22 and 32]

The parties have filed cross-motions for summary judgment regarding the scope of the insurance coverage at issue.  The material facts of the case outlined above are agreed upon by the parties, so there are no issues of material fact.  Thus, a legal determination is needed as to whether the fraud in question is covered by the Policy.

### A.    Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

9

56(a). "The moving party bears 'the initial responsibility of informing the . . .

court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of

material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir.

2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal

quotations omitted)). Where the moving party makes such a showing, the burden

shifts to the non-movant, who must go beyond the pleadings and present

affirmative evidence to show that a genuine issue of material fact does exist.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The applicable

substantive law identifies which facts are material. Id. at 248. A fact is not

material if a dispute over that fact will not affect the outcome of the suit under the

governing law. Id. An issue is genuine when the evidence is such that a reasonable

jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all

evidence and draw all reasonable inferences in the light most favorable to the

non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th

Cir. 2002). But, the court is bound only to draw those inferences that are

10

reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted); <u>see also</u> <u>Matsushita</u>, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

### B.    Analysis - Coverage

Principle contends that the loss at issue is covered by Section A.6.a.(2). of the Commercial Crime Policy which provides coverage for loss "resulting directly from a 'fraudulent instruction' directing a 'financial institution' to debit your 'transfer account' and transfer, pay or deliver 'money' or 'securities' from that account." Principle argues that its loss resulted directly from the fraudulent email that appeared to have been sent by Mr. Nazarian. In support of its denial of coverage, Ironshore argues that the loss did not result "directly" because: (1) additional information for the wire was conveyed to Principle by Mr. Leach after

11

the initial email, and (2) Principle's employees set up and approved the wire transfer.

The Court finds that the language of the provision at issue is ambiguous. "When the language of an insurance contract is ambiguous and subject to more than one reasonable construction, the policy must be construed in the light most favorable to the insured, which provides him with coverage." Western Pacific Mut. Ins. Co. v. Davies, 601 S.E.2d 363, 369 (Ga. Ct. App. 2004). It is reasonable for Plaintiff to interpret the language of the policy to provide coverage even if there were intervening events between the fraud and the loss. Defendant's interpretation, which would require an immediate link between the injury and its cause, is also reasonable. In this circumstance, the Court must construe the policy in the light most favorable to Plaintiff and provide coverage. This is consistent with the District Court's decision in Apache Corp. v. Great Am. Ins. Co., Civil Action No. 4:14-CV-237, 2015 WL 7709584, at *3 (S.D. Texas Aug. 7, 2015), in which the Court stated that adopting the insurance company's reading would be "to limit the scope of the policy to the point of almost non-existence." As in Apache, Plaintiff here could act only through its officers and employees. If some employee interaction between the fraud and the loss was sufficient to allow

Defendant to be relieved from paying under the provision at issue, the provision would be rendered "almost pointless" and would result in illusory coverage.  Id.

As to coverage, Plaintiff's Motion for Partial Summary Judgment [Doc. No. 22] is GRANTED, and Defendant's Motion for Summary Judgment [Doc. No. 32] is DENIED as moot.

### C.    Analysis - Bad Faith

Defendant has also moved for summary judgment as to Plaintiff's bad faith claim. O.C.G.A. § 33-4-6 provides the exclusive remedy for an insured's bad faith refusal to pay insurance proceeds. Great Southwest Express Co. v. Great Am. Ins. Co., 665 S.E.2d 878 (Ga. Ct. App. 2008).  For Plaintiff to prevail on a claim for bad faith, it must prove: (1) that the claim is covered under the Policy; (2) that a demand for payment was made against the insurer within 60 days prior to filing suit; and (3) that the insurer's failure to pay was motivated by bad faith.  Lawyers Title Ins. Co. v. Griffin, 691 S.E.2d 633, 636 (Ga. Ct. App. 2010) (citation omitted).

To determine whether the insurer engaged in bad faith, an insured must show by evidence that "under *the terms of the policy* upon which the demand is made and under the facts surrounding the response to that demand, the insurer had

AO 72A
(Rev.8/8
2)

no 'good cause' for resisting and delaying payment." Id. (citing Georgia Intl. Life Ins. Co. v. Harden, 280 S.E.2d 863, 866 (Ga. Ct. App. 1981) (emphasis in original). Courts grant summary judgment to insurers on bad faith claims where the issue of liability was close. See, e.g., Homick v. Am. Casualty Co., 433 S.E.2d 318, 319 (affirming grant of summary judgment to insurer on bad faith: "Ordinarily, the question of good or bad faith is for the jury, but when there is no evidence of unfounded reason for the nonpayment, or if the issue of liability is close, the court should disallow imposition of bad faith penalties. Good faith is determined by the reasonableness of nonpayment of a claim.") (quoting Intl. Indem. Co. v. Collins, 367 S.E.2d 786, 786 (Ga. 1988)).

The Court finds that the issue of liability was close in this case. It was not "unreasonable" or "unfounded" for Defendant to deny coverage here and wait for this Court to determine the coverage required by the contract. As such, Defendant is entitled to summary judgment on Plaintiff's bad faith claim, and its Motion for Summary Judgment [Doc. No. 32] as to the bad faith claim is GRANTED.

## VI.    Conclusion

For the reasons stated above, Plaintiff's Motion to Exclude [Doc. No. 38] is GRANTED.  Plaintiff's Motion for Judicial Notice [Doc. No. 39] is GRANTED

AO 72A
(Rev.8/8
2)

in part and DENIED in part.  As to coverage, Plaintiff's Motion for Partial

Summary Judgment [Doc. No. 22] is GRANTED, and Defendant's Motion for

Summary Judgment [Doc. No. 32] is DENIED as moot.  As to the bad faith claim,

Defendant's Motion for Summary Judgment [Doc. No. 32] is GRANTED.  The

Clerk is DIRECTED to enter judgment and close this action.

     **SO ORDERED**, this 30th day of August, 2016.

 

**RICHARD W. STORY**
United States District Judge